UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

OKEMO MOUNTAIN, INC.,           :
    Plaintiff and              :
    Counter-Defendant,         :
                                   :
    v.                         :
                                     :
PATRICK J. SIKORSKI,            :       File No. 1:93-CV-22
    Defendant and              :
    Counter-Claimant.          :
                                     :
_____:

RULING ON POST-TRIAL MOTIONS
(Papers 251, 275, and 279)

## I.   Introduction

This case began as an action under 12 V.S.A. § 506 by
plaintiff/counter-defendant Okemo Mountain, Inc. ("Okemo") to
renew a judgment rendered in 1995 against defendant/counter-
claimant Patrick J. Sikorski ("Sikorski"), but expanded when
Sikorski filed various affirmative defenses and counterclaims.
The most recent twist in this gordian litigation occurred at the
conclusion of the April 2006 trial, when the jury found, among
other things, that Sikorski should be awarded compensatory
damages against Okemo in the amount of $650,000 based on findings
of fraud, fraudulent concealment, fraudulent misrepresentation,
abuse of process, and intentional infliction of emotional
distress ("IIED").  A flurry of post-trial motions ensued,
including motions filed by intervenors Richard Coutant and Salmon

& Nostrand ("Intervenors").  Upon careful review of the filings
and trial record, the Court rules as follows:

1.   Okemo's motion for judgment as a matter of law is
     GRANTED as to the jury's findings concerning the
     release, fraud, estoppel, fraudulent concealment,
     fraudulent misrepresentation, and abuse of process, and
     DENIED as to the jury's finding of IIED;

2.   Intervenors' motion for judgment as a matter of law is
     construed as a memorandum, thereby rendering the motion
     moot.

3.   Okemo's and Intervenors' alternative motions for a new
     trial are GRANTED to the extent that a new trial is
     necessary to determine the appropriate amount of
     damages related to the IIED finding; and

4.   As an alternative to a new trial, Sikorski shall have
     until December 15, 2006 to notify the Court whether he
     agrees to remit that portion of the jury award
     exceeding $250,000.  Should Sikorski refuse to make
     such remittitur, this case shall be set for the January
     2007 trial calendar to determine the appropriate amount
     of damages.

Further, it is hereby ORDERED that:

1.   Sikorski's renewed motion for equitable relief from the
     1995 judgment is GRANTED;

2.   Okemo's request to renew the 1995 judgment is DENIED;

3.   The 1995 judgment is VACATED in full; and

4.   Okemo shall return any money collected thus far from
     Sikorski in partial fulfillment of the 1995 judgment.

II.  <u>Background</u>[1]

In 2003, Okemo brought this action to renew a 1995 judgment for approximately $450,000 rendered against Sikorski.[2]  Paper 104.  In response, Sikorski sought to vacate the judgment under Fed. R. Civ. P. 60(b), arguing that a general release entered into by Okemo and the United States Sporting Clays Association ("USSCA") in 1995 -- the text of which was not known to Sikorski until May 2003 -- absolved him of all liability, or alternatively, that extraordinary circumstances warranted granting relief.  Paper 110.

On October 23, 2003, this Court ruled in favor of Okemo on cross motions for summary judgment, concluding that Okemo's intent had been to release agents acting within the scope of agency, but not Sikorski, who also acted individually.  Paper 121.  The Second Circuit Court of Appeals subsequently vacated

---

[1]The following factual recitation sets forth those facts necessary to decide the pending matters.  The interested reader is referred to the various opinions and rulings previously made during the course of this multi-chaptered dispute between Okemo and Sikorski.  <u>See</u>, <u>e.g.</u>, <u>Okemo Mountain, Inc. v. U.S. Sporting Clays Ass'n</u>, 376 F.3d 102 (2d Cir. 2004).

[2]Following a bench trial in 1995, Judge Billings found Sikorski, acting individually, had fraudulently induced Okemo to host a game fair by various misrepresentations, resulting in damages of $424,478.86; had unjustly enriched himself by double billing in the amount of $50,388.35, an amount included in the $424,478.86; and had obtained $25,000 by intentionally violating a covenant not to compete.  <u>See</u> Paper 96.  Mr. Sikorski appealed, and the Second Circuit dismissed, subject to the right to reinstate following conclusion of bankruptcy proceedings; however, Sikorski did not timely reinstate his appeal.  A Connecticut bankruptcy court ruled that the 1995 judgment was nondischargeable.  <u>See</u> <u>In re Sikorski</u>, 239 B.R. 661 (Bankr. D. Conn. 1999).

that ruling, explaining that the issue to be determined upon remand was: "whether, under Vermont law, the release can be construed to bar claims against Sikorski in his individual capacity, since the underlying judgment Okemo seeks to renew found Sikoski liable only in his individual capacity."  See Okemo, 376 F.3d at 104.  The Circuit further held that "a trial is warranted to determine what was contemplated by the parties at the time the release was executed"; specifically, whether the agreement released Sikorski in his agency capacity only or also in his individual capacity.  Id. at 105.

Following remand, Sikorski filed an answer to Okemo's action to renew the judgment, asserting affirmative defenses of release, estoppel, and fraud.  Sikorski also brought an independent action in equity pursuant to Rule 60(b) alleging fraud, and counterclaims for fraudulent misrepresentation, abuse of process, and IIED.[3]  Paper 128.  Sikorski's central assertion was that Okemo and Mueller "misrepresented material facts to Sikorski and to this Court by omitting any disclosure of the General Release and the consideration paid by the other defendants in that action

---

[3]Sikorski additionally brought counterclaims for defamation, malicious prosecution, and negligence, and various claims against third-party-defendant Timothy T. Mueller ("Mueller"), president of Okemo.  Paper 128.  Prior to trial, the Court dismissed the defamation claim and granted summary judgment to Okemo and Mueller on the malicious prosecution claim.  Paper 185.  At the close of trial testimony, the Court dismissed all claims against Mueller and granted judgment to Okemo on the negligence claim. Docket Entries 253, 254.

that reduced damages, both prior to the trial and for more than eight years thereafter."  Paper 128 ¶ 28.

During the week of April 3-7, 2006, the Court held a jury trial on all claims and reserved judgment on the equitable determination to renew the judgment.  Before the case was submitted to the jury, Sikorski renewed his motion under Fed. R. Civ. P. 60(b) for equitable relief from the 1995 judgment. Paper 251.  Also at that time, Okemo moved under Fed. R. Civ. P. 50(a) for judgment as a matter of law.  The Court denied Okemo's motion.  Docket Entry 253.  Pursuant to the Court of Appeals' mandate in Okemo, the jury considered whether the 1995 release "was intended to release the fraudulent inducement claim by Okemo against Sikorski."  Paper 257.  The jury also considered whether Sikorski had proven that Okemo, through its attorney Richard Coutant ("Coutant"), had committed fraud upon the court; whether Okemo was estopped from executing or renewing the 1995 judgment; and whether Okemo was liable to Sikorski for fraudulent concealment, fraudulent misrepresentation, abuse of process, and intentional infliction of emotional distress.  Paper 257.  The jury answered all questions in the affirmative and awarded Sikorski $650,000 in compensatory damages for Okemo's wrongdoing, but no punitive damages.  Paper 255.

Thereafter, the Court granted Coutant's and Salmon & Nostrand's application to intervene, Papers 264, 276, and the instant post-trial motions were filed.

III. <u>Discussion</u>

    A.   <u>Okemo's and Intervenors' Motions for Judgment as a<br>Matter of Law</u><br>       (Papers 275, 279)

A motion for judgment as a matter of law should be granted when "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed. R. Civ. P. 50(a)(1). In other words, the Court must determine whether, "viewed in the light most favorable to the nonmoving party, the evidence is such that, without weighing the credibility of witnesses or otherwise considering the weight of evidence, there can be but one conclusion as to the verdict that reasonable [persons] could have reached." <u>Indu Craft, Inc. v. Bank of Baroda</u>, 47 F.3d 490, 494 (2d Cir. 1995) (internal quotation marks and citations omitted).

A party may file a post-trial motion for judgment as a matter of law only where, as in Okemo's case, it has first moved prior to submission of the case to the jury. Fed. R. Civ. P. 50(b); Docket Entry 253. Because Intervenors did not move for judgment as a matter of law under Rule 50(a) before the case was submitted to the jury (since they had not yet applied to intervene), the Court cannot construe their motion as one under Rule 50(b). The Court therefore construes their Rule 50(a) motion as a post-trial memorandum addressing their interests in the case at this time, as provided in the ruling on the application to intervene. <u>See</u> Paper 276.

6

1.   <u>Jury finding concerning the 1995 release</u>

At the conclusion of the April trial that followed the
Second Circuit's remand, the jury found the 1995 release was
intended to release Sikorski from Okemo's fraudulent inducement
claim.[4]  Paper 255.  Therefore, to grant Okemo's motion on this
issue, the Court must determine whether, viewing the evidence in
the light most favorable to Sikorski, the only conclusion the
jury could have reached is that Okemo and USSCA did <u>not</u> intend to
release Sikorski from the fraudulent inducement claim against him
in his individual capacity.

Having exhaustively reviewed the parties' filings and the
trial transcript, the Court concludes that no reasonable jury
could have decided that the release was intended to cover the
fraudulent inducement claim against Sikorski as an individual.
As a starting point, the consistent testimony of Stacy Chapman
("Chapman"), who was the attorney for USSCA president Bob Davis
during the negotiation and execution of the release, and Coutant,
who was the attorney for Okemo during the negotiation and
execution of the release, confirmed that their intent was not to
release Sikorski in his individual capacity on the fraudulent
inducement claim; an intent supported by the surrounding
circumstances:

---

[4]The Court agreed to narrow the jury's inquiry to whether
Okemo intended to release Sikorski from the fraudulent inducement
claim.  Trial Transcript ("TT") Day 4 at 265-67.

7

- Chapman testified that shortly before the 1995 trial, he alone negotiated with Coutant for the settlement of all of Okemo's claims against Davis for $55,000.  To protect Davis from being "dragged back into [the litigation]," Chapman also negotiated a settlement of Okemo's claims against USSCA in exchange for assignment of a (worthless) promissory note, TT Day 3 at 14-15;

- Chapman drafted both releases -- between Okemo and Davis, and between Okemo and USSCA -- using standard release forms and forwarded them to Coutant on February 6 and 9, 1995.  TT Day 3 at 14-17, 25.  Chapman testified that use of the word "agents" in the USSCA release, although already "in the form," was to protect Davis as president of USSCA,  TT Day 3 at 25-26;

- Chapman further testified that Coutant stated during the release negotiations that Okemo still intended to pursue its claims against Sikorski.[5]  Coutant likewise testified that he told Chapman during negotiations that Okemo was going to pursue its claims against Sikorksi in his individual capacity.  TT Day 2 at 80.  Chapman testified that his response was "what they did against Mr. Sikorski really was none of my business so long as I was assured that Mr. Davis was [sic] not somehow be dragged back into the case,"  TT Day 3 at 10;

- Coutant testified that "it was Okemo's intention, and my intention, and my understanding with Mr. Chapman, that this release did not apply to Mr. Sikorski for actions which he undertook on his own behalf as an individual not as an agent for USSCA,"  TT Day 1 at 45-46;

- Okemo proceeded to trial against Sikorski on the fraudulent inducement, double billing, and breach of covenant not to compete claims;

- Sikorski testified that, through contemporaneous conversations with Davis, he was aware of the settlement negotiations between Okemo and Davis, as well as Davis' and USSCA's payments to Okemo, but he did not participate in the discussions and did not seek

---

[5]Notably, this testimony clarifies a fact issue at odds with the Court of Appeals' finding in Okemo that Chapman "was not aware that Okemo proceeded to trial against Sikorski -- he assumed Okemo settled with all parties through release instruments."  376 F.3d at 105; see also TT Day 4 at 178-79.

discovery regarding the settlement.  TT Day 4 at 45-53.[6]

Nevertheless, it was entirely within the province of the jury to disbelieve certain witness testimony.  But in order to do so and reach the conclusions the jury did, there must at least be some evidence to find that the parties intended to release Sikorski individually.  To meet his burden[7] at trial in the face of the consistent testimony of those involved in negotiating and signing the release, Sikorski's counsel, Bradford Fawley ("Fawley"), attempted to show that before the release was signed, the fraudulent inducement claim was only pled and intended to be pled against Sikorksi as an agent of USSCA, not based upon any individual actions of Sikorski.  Further, Fawley's prevailing theory at trial challenged Judge Billings' decision by arguing that all damages were caused by Sikorski while Sikorski was acting as USSCA's agent. For instance:

- in his opening, Fawley stated: "We will prove that those alleged fraudulent acts were taken by Sikorski as agent of USSCA and, in fact, Okemo has admitted that," TT Day 1 at 38;

- in his opening, Fawley also stated that the 1995 case was "based on the very same acts, we will show, that he

---

[6]In addition to this testimony, it is important to note that at trial, Sikorski went to great lengths to show that Mueller and Okemo had a personal vendetta against him and hatched a plan to pursue him no matter what.  If so, it would be surprising for them to so easily abandon their claims against Sikorski in his individual capacity by including him in the release for a relatively negligible sum.

[7]At all times it was Sikorski's burden to show by a preponderance of the evidence that he was included within the class of persons released.  See Paper 257 at 12.

> committed as agent for which they had just released
> him,"  TT Day 1 at 39;

- in his closing, Fawley alluded to the absence of
  individual actions by Sikorski by stating: "I can't
  remember a specific action Mr. Sikorski took as an
  individual."  TT Day 5 at 39.

So, in reaching its conclusions, the jury necessarily relied on
Fawley's presentation that the fraudulent inducement claim was
not pled or intended to be pled as a claim against Sikorski in
his individual capacity and potentially revisited Judge Billings'
1995 final judgment that Sikorski was liable for this claim in
his individual capacity.

There are two primary reasons why these conclusions could
not be reached by reasonable persons.  For one, these findings
completely ignore the undisputed fact that the portion of Okemo's
1993 complaint pertaining to the fraudulent inducement claim
unequivocally stated: "As the direct and proximate result of the
wrongful conduct of USSCA, Bob L. Davis, and Patrick J. Sikorski,
each individually and in their representative capacity, Okemo has
suffered substantial loss and damage."  Paper 1 ¶ 119 (emphasis
added).  No later court filing narrowed the scope of this Count,
and as memorialized in Judge Billings' decision and already found
by this Court, although the case against Sikorski was initially
based on Sikorski's actions as an individual and as an agent of
USSCA, after the settlement with USSCA, the action proceeded to
trial on Sikorski's behavior as an independent actor.  The
somewhat confused (and confusing) testimony of what Mueller may

have understood or not understood about the nuances of individual versus agency liability does not, even when viewed in a light most favorable to Sikorski, change the fact that the lawsuit was initiated, maintained, and tried by Okemo against Sikorski in both his individual and representative capacities.  Further, there is absolutely zero probative value to the fact that Okemo referred to Sikorski as an agent of USSCA in pleadings with the Court prior to the execution of the releases, considering that it is beyond question that one of Okemo's theories of liability against USSCA was premised upon agency law.

Second, to the extent the jury may have been influenced by Fawley's argument that all of Sikorski's actions surrounding the fraudulent inducement claim were only actions taken as an agent, it was improper.  In this regard, it should be remembered that in ruling upon motions prior to trial, the Court found Fawley's attempt to rekindle this exact defense to be "an impermissible collateral attack on the 1995 judgment" and barred by res judicata because "knowledge of the release does not change the fact that [Sikorski] could have argued at trial [in front of Judge Billings] the defense that he was acting as USSCA's agent." Paper 185 at 13.  The Court again made this ruling clear to Sikorski and Fawley when it granted Okemo and Mueller's motion in limine "to exclude any efforts to show that Sikorski only acted as an agent of United States Sporting Clays Association and never acted in his individual capacity in connection with the 'game

fairs'" because "such efforts would be an impermissible attack on the 1995 judgment."  Paper 230 at 3.

>       2.   <u>Jury findings concerning fraud upon the court and estoppel</u>

Similarly, the jury's findings as to fraud on the court and estoppel wilt under the glare of inspection because the Court finds they are inextricably linked with the scope and intent of the release.  In other words, the common thread in the fabric of this entire case is the notion that Okemo concealed a release that, because it covered Sikorski, would have provided Sikorski with a viable defense at the 1995 trial; and as the Court instructed the jury, Sikorski believes this "constitutes a fraud upon the court, fraudulent concealment, and fraudulent misrepresentation, as well as abuse of process in obtaining and pursuing the 1995 Judgment."  Paper 257 at 2; <u>see also</u> <u>id.</u> at 17 (explaining that "[i]n deciding the question of estoppel, [jurors] will have to consider, among other things, the scope of the Release between Okemo and USSCA").  This interdependent relationship between the scope of the release on the one hand, and estoppel and fraud upon the court on the other hand, has also been clearly acknowledged by Sikorski himself: "The jury has found, unequivocally, that Okemo through its lawyers committed fraud and fraud on the court, and is estopped to renew the judgment, <u>because</u> Okemo released Sikorski from the claims it then went ahead and tried against him, knowing it had released those claims."  Paper 281 at 4 (emphasis added); <u>see also</u> <u>id.</u> at 4-5

(emphasizing that Intervenors have correctly observed that
Sikorski's claim for fraud on the court is based upon the
allegation that Okemo knew the release covered Sikorski).

Fraud upon the court, moreover, requires evidence of bad
faith.  See Transaero, Inc. v. La Fuerza Area Boliviana, 24 F.3d
457, 460-61 (2d Cir. 1994).  Here, there is no evidence, much
less clear and convincing evidence, of a fraudulent intent by
Coutant at any point during this lengthy litigation, including in
front of Judge Billings, the Connecticut bankruptcy court, and
the Second Circuit.  At best, the statements and surrounding
circumstances relied upon by Sikorski to show fraud on the Court
evidence lack of knowledge, failed memory or reasonable mistake.
As to his understanding of the release, Coutant testified that he
still "do[es] not believe we did pursue claims that were covered
by the release," TT Day 2 at 131, and that he had a "clear
conscience" on the matter.  TT Day 2 at 63.  The fact that
Coutant readily turned over the release to Fawley and granted
Fawley full access to his files supports his testimony.  TT Day 2
at 121.

      3.   <u>Jury findings concerning fraudulent concealment,
          fraudulent misrepresentation, and abuse of process</u>

Because the findings concerning the release, fraud on the
court, and estoppel cannot stand, the jury should never have
addressed Sikorski's claims of fraudulent concealment, fraudulent
misrepresentation, and abuse of process.  See Paper 255
(instructing the jury that answering "no" to the questions of

13

release, fraud on the court, and estoppel necessitates by-passing question four of the Verdict Form, which addresses fraudulent concealment, fraudulent misrepresentation, and abuse of process).

### 4.   Jury findings concerning IIED

In contrast to his other affirmative defenses and claims, Sikorki's claim of IIED is well-removed from the scope of the 1995 release.  The IIED count was pled, not just based upon non-disclosure of a release that would have provided a defense at the 1995 trial, but also based upon Okemo's pursuit of Sikorski and overall aggressive litigation and post-judgment collection efforts.  See Paper 128 at ¶¶ 1, 18 (Okemo has "for more than eight years directed their agents and attorneys to aggressively pursue collection of the judgment through legal process to identify and attach Sikorski's wages and assets"); see also Paper 255 (instructing that even if the jury answers "no" to the questions of release, fraud upon the court, and estoppel, the jury shall still proceed to answer the question of whether Okemo is liable to Sikorski for IIED).

Under Vermont law, the elements of IIED are (1) extreme and outrageous conduct, (2) done intentionally or with reckless disregard of the probability of causing emotional distress, (3) resulting in the suffering of extreme emotional distress, that is (4) actually or proximately caused by the outrageous conduct. See Fromson v. State, 176 Vt. 395, 399 (2004).  A successful IIED claim must involve conduct "so outrageous as to surpass all

14

possible bounds of decency, and . . . regarded as atrocious, and utterly intolerable in a civilized community." <u>Gallipo v. City of Rutland</u>, 163 Vt. 83, 94 (1994) (internal quotation marks and citations omitted).  An IIED claim will not stand, however, if the relevant conduct consists of "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." <u>Fromson</u>, 176 Vt. at 399-400 (citing Restatement (Second) of Torts § 46 cmt. d).

Viewed in the light most favorable to Sikorski, the Court finds there was sufficient evidence for a reasonable jury to conclude that Okemo's actions fell within the spectrum of intentional extreme and outrageous conduct such that it was liable for IIED.  The evidence showed that Okemo pursued its claims and attempted to collect its judgment against Sikorski knowing that he was "judgment proof," <u>i.e.</u>, that Sikorski "had no capacity to pay a judgment" and in fact, at the time was $300,000 in debt.  TT Day 1 at pp. 108-17.  Okemo then spent years hounding Sikorski, still knowing that he did not have the money required to fulfill the judgment.  In so doing, Okemo obtained a twenty-five dollar per week levy on Sikorski's wages which negatively impacted his employment, attached certain money that did not belong to Sikorski (but in fact belonged to Sikorski's family and friends and was intended to fund Sikorski's fiftieth birthday party), and, upon learning that Sikorski's mother had been diagnosed with terminal cancer, engaged in a plan to monitor

the Florida obituaries and local news so that Okemo would be one of the first to know when Sikorski's mother died in order to immediately seek proceeds from her estate.  <u>See</u>, <u>e.g.</u>, TT Day 2 at 45-60, 185-87; TT Day 3 at 139-43.  A reasonable jury could have found that this latter, somewhat morbid, conduct by Okemo offers at least one incident of behavior "that transcends the ignoble and vast realm of unpleasant" conduct that may be expected by an entity attempting to collect a judgment.  <u>Fromson</u>, 176 Vt. at 400 (discussing how an IIED claim in the employment context must show at least one significant outrageous act).  While the standard of establishing outrageous conduct is "necessarily a high one," <u>Denton v. Chittenden Bank</u>, 163 Vt. 62, 66 (1994), the facts of this case go beyond simply sending a demand letter for an amount beyond the recipient's means and refusing to settle.  <u>See</u> <u>Schwartz v. Frankenhoff</u>, 169 Vt. 287, 299 (1999) (finding such conduct by creditors failed to state a claim for IIED).  Instead, Okemo's motivation in pursuing Sikorski, the amount of time spent doing so, as well as the methods employed by Okemo, could reasonably be viewed by the jury as atrocious and intolerable in this society.  It was also reasonable for the jury to conclude that Okemo intended to cause severe emotional distress to Sikorksi, or at least acted in reckless disregard of that possibility, since Okemo believed Sikorski to be judgment proof.  Finally, Sikorski's extreme suffering and causation is amply supported by his own testimony

and the testimony of Patricia Healing, Cindy Rinfert, and Dr.
Phillip Kinsler.  TT Day 4 at 77-171.

     In sum, the Court grants Okemo's motion for judgment as a
matter of law as it relates to the jury findings of release,
fraud on the Court, estoppel, fraudulent concealment, fraudulent
misrepresentation, and abuse of process, but denies Okemo's
motion as it relates to the jury's finding of IIED.

     B.   <u>Okemo's and Intervenors' Alternative Motions for a New
          Trial</u>
          (Papers 275, 279)

     This Court's previous conclusions render Okemo's and
Intervenors' alternative motions for a new trial under Fed. R.
Civ. P. 59(a) moot, except as they relate to the jury's findings
of IIED and damages in the amount of $650,000.  As to liability,
the alternative motions are denied because the jury has not
reached a "seriously erroneous" result; nor could the verdict be
viewed as against the weight of the evidence so as to be termed a
"miscarriage of justice."  <u>See</u> <u>Manley v. Ambase Corp.</u>, 337 F.3d
237, 244-45 (2d Cir. 2003) (internal quotation marks and
citations omitted).  Quite frankly, the Court was shocked that
Okemo even chose to pursue Sikorski knowing he was judgment
proof, and with that knowledge, continued to pursue him in such a
way that can be characterized as systematic, drawn-out, and
debasing.

     As to the jury's award of $650,000 to Sikorski, it was
necessarily based upon on all of the jury's findings, not just

the finding of IIED.  Thus, this Court is unable to distinguish the valid amount of damages from the unsupported amount, necessitating a new trial on the sole issue of damages resulting from IIED.  Additionally, the Court finds the jury verdict to be excessive in light of the rare circumstances of this case, including the fact that the Court, as discussed below, is vacating the 1995 judgment.

Before proceeding to another trial on damages though, the Court sua sponte suggests a remittitur which reduces the damage award from $650,000 to $250,000.  See, e.g., Peterson v. County of Nassau, 995 F. Supp. 305, 312 (E.D.N.Y. 1998) ("A court may, sua sponte offer a remittitur as an alternative to a new trial.").  Sikorski may accept such reduction by December 15, 2006, or proceed to a new trial on the issue of damages.

C.   Sikorski's Motion for Equitable Relief
     (Paper 251)

Sikorski's renewed motion for equitable relief from the 1995 Judgment is made pursuant to Fed. R. Civ. P. 60(b)(5) and (b)(6). Rule 60(b) provides:

> On motion and upon such terms as are just, the court may relieve a party . . . from a final judgment, order, or proceeding for the following reasons: . . . (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment . . . .  This rule does not limit the power of a court to entertain an independent action to relieve a party from a judgment, order, or proceeding, or to grant relief to a defendant not actually personally notified as provided in Title

28, U.S.C., § 1655, or to set aside a judgment for fraud upon the court.

This rule is a "grand reservoir of equitable power to do justice in a particular case," Marrero Pichardo v. Ashcroft, 374 F.3d 46, 55 (2d Cir. 2004) (quoting Matarese V. Lefevre, 801 F.2d 98, 106 (2d Cir. 1986)), and is designed to balance "the sanctity of final judgments" and the command "that justice be done in light of all the facts." Paddington Partners v. Bouchard, 34 F.3d 1132, 1144 (2d Cir. 1994) (citing Bankers Mortgage Co. v. United States, 423 F.2d 73, 77 (5th Cir. 1970)).  It has been often noted that Rule 60(b) "confers broad discretion on the trial court to grant relief when appropriate to accomplish justice." Id.  Relief under Rule 60(b)(6), however, "should not be granted casually, but rather is properly invoked only where there are extraordinary circumstances justifying relief, when the judgment may work an extreme hardship, and when the asserted grounds for relief are not recognized in clauses (1)-(5) of the Rule." Stonewall Ins. Co. v. Nat'l Gypsum Co., 1992 WL 51567, at *6 (S.D.N.Y. Mar. 9, 1992).  As in other instances when the trial court is afforded broad discretion, the trial court's decision is generally not reviewable on appeal absent a clear abuse of discretion.  See Altman v. Connally, 456 F.2d 1114, 1116 (2d Cir. 1972).

The Court is aware that Rule 60(b)(6) motions are not, by any stretch, granted on a routine basis.  As cogently explained by the Second Circuit:

> Very high among the interests in our jurisprudential system
> is that of finality of judgments.  It has become almost a
> judicial commonplace to say that litigation must end
> somewhere, and we reiterate our firm belief that courts
> should not encourage the reopening of final judgments or
> casually permit the relitigation of litigated issues out of
> a friendliness to claims of unfortunate failures to put in
> one's best case.

United States v. Cirami, 563 F.2d 26, 33 (2d Cir. 1977).

Nevertheless, the Court, intimately familiar with the byzantine nature of this litigation, concludes that it presents extraordinary circumstances which, when considered cumulatively, justify relief: (1) the case has gone on for 13 years and to date has involved 2 trials and an appeal - in Okemo's words, "[i]t would be hard to find a case with a more tangled and tortured procedural history," Paper 167 at 2; (2) even though the gaming event was not a success on paper, Okemo received considerable positive exposure, so much so that it desired to hold the event again the next year; (3) Mueller and Okemo knew Sikorski was "judgment proof" yet still pursued him fully, knowing he was not represented by an attorney, while settling with the deeper pocket defendants for a relatively small amount of money; (4) Sikorski represented himself at the first trial; (5) nearly a decade of collection efforts have yielded a paltry sum yet served to ruin Sikorski both financially and psychologically; and (6) a jury was persuaded Sikorski was entitled to damages from Okemo's wrongdoing.

Apart from the presence of extraordinary circumstances, the Court is convinced that the 1995 judgment has worked an extreme

hardship on many, if not all of the people involved in this case. It has ruined Sikorski, impacted Sikorski's family members and those close to him, brought embarrassment to Okemo and Mueller, almost irreparably, yet undeservedly, tarnished the reputation of one of the members of this bar and his firm, and resulted in countless hours of useless collection efforts and further litigation.  Admittedly, the 1995 judgment did hold a man accountable for his wrongful actions.  But Sikorski's actions do not come close to justifying the unenviable positions in which everyone involved in this litigation finds themselves today.

Accordingly, the Court exercises its equitable powers and grants Sikorski's Rule 60(b)(6) motion for equitable relief.  In turn, the Court declines to renew and extend the 1995 Judgment for the additional eight-year period.

IV.  <u>Conclusion</u>

For the reasons discussed above:

1.   Okemo's motion for judgment as a matter of law, Paper 275, is GRANTED as to the jury's findings concerning the release, fraud, estoppel, fraudulent concealment, fraudulent misrepresentation, and abuse of process, and DENIED as to the jury's finding of IIED;

2.   Intervenors' motion for judgment as a matter of law, Paper 279, is construed as a memorandum, thereby rendering the motion moot.

3.   Okemo's and Intervenors' alternative motions for a new trial, Papers 275, 279, are GRANTED to the extent that a new trial is necessary to determine the appropriate amount of damages related to the IIED finding; and

4.   As an alternative to a new trial, Sikorski shall have until <u>December 15, 2006</u> to notify the Court whether he agrees to remit that portion of the jury award

exceeding $250,000.  Should Sikorski refuse to make such remittitur, this case shall be set for the January 2007 trial calendar to determine the appropriate amount of damages.

Further, it is hereby ORDERED that:

1.   Sikorski's renewed motion for equitable relief from the 1995 judgment, Paper 251, is GRANTED;

2.   Okemo's request to renew the 1995 judgment is DENIED;

3.   The 1995 judgment is VACATED in full; and

4.   Okemo shall return any money collected thus far from Sikorski in partial fulfillment of the 1995 judgment.

SO ORDERED.

Dated at Brattleboro, Vermont, this 16th day of November, 2006.

/s/ J. Garvan Murtha
J. Garvan Murtha
United States District Judge